UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA CLARK,

      Plaintiff,

v.                                                    Case No. 05-73511

JUDGE CRAIG ALSTON,                    Honorable Patrick J. Duggan
in his individual capacity,

      Defendant.

_____/

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan on July 11, 2006.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

On August 25, 2005, Lisa Clark filed a claim against Defendant Judge Craig Alston

pursuant to 42 U.S.C. § 1983, alleging that Defendant violated her First Amendment right

to freedom of intimate association when he withdrew Plaintiff's offer of employment

after learning that Plaintiff was married to a former inmate. Presently before the Court is

Defendant's Motion for Summary Judgment and Motion to Dismiss, filed on March 15,

2006. The Court heard oral arguments on the Motion on May 11, 2006.

## I.  Factual Background

On October 22, 2004, Plaintiff submitted a resume and cover letter as an application for a probation officer position with the 74th District Court Probation Department.  On November 5, 2004, Judge Craig Alston, Judge Timothy Kelly, Chief Probation Officer Lori Winiecke, and Probation Officer Jennifer Cunningham, interviewed Plaintiff.

On her resume, Plaintiff had only listed employment from 1999 through 2004. During the interview, Winiecke asked Plaintiff about her work experience prior to 1999.

Plaintiff told the interview panel that she was previously employed by the Michigan Department of Corrections (MDOC) as a corrections officer at the Standish Correctional Facility, but that she left on bad terms.  (Clark Dep. at 40-41).  Plaintiff told the panel that after she turned down a proposition from an inmate, he complained that she was having an improper relationship, which led the prison to commence an investigation into the allegation.  (*Id.* at 41).  Plaintiff then told the panel that, rather than go through the investigation, she resigned from her position.  (*Id.* at 43).  During the interview, the panel never asked any follow-up questions and Plaintiff did not offer up any additional information.  (*See id.* at 41-43).  According to Plaintiff, she in no way indicated that the inmate she was accused of having an improper relationship with was the same person who turned her in.  (*See id.*).

The panel recommended Plaintiff for the position.  Judge Alston, who was the final decision-maker, decided to hire Plaintiff.

On November 9, 2004, Winiecke offered Plaintiff the job.  (Resp. Ex. 2).  Plaintiff accepted and agreed to start on November 24, 2004.

Before Plaintiff started work, however, Winiecke learned from Jennifer Barnes, a

2

local defense attorney, and a friend, Dominique Smith, whose husband had worked at Standish with Plaintiff, that Plaintiff had a relationship with an inmate whom she later married.  (Mot. Ex. 2, Winiecke Dep. at 33-37).  After Winiecke told Judge Alston what she had learned, Judge Alston asked Winiecke to confront Plaintiff about the discrepancy.  (Mot. Ex. 3, Alston Dep. at 13).  Judge Alston also asked Winiecke to give Plaintiff the option of signing a release so that he could obtain her employment file from the MDOC or withdrawing her acceptance of the position.  (*Id.* at 13-14).

Winiecke called Plaintiff on November 19, 2004.  According to Plaintiff, Winiecke said to Plaintiff, "we have a problem, you didn't tell us who you were married to."  (Clark Dep. at 45).  Winiecke contends that Plaintiff became very angry and defensive during the conversation.  (Winiecke Dep. Ex. 4).  Plaintiff told Winiecke that she would prefer to deal with Judge Alston directly.  (Clark Dep. at 49).  Later that day, after consulting with her attorney, Plaintiff agreed to sign the release but asked to be present when it was reviewed.  (Winiecke Dep. Ex. 4).

On November 23, 2004, Plaintiff wrote a letter to Judge Alston agreeing to turn over her copy of the investigation from Standish.

On November 24, 2004, Judge Alston wrote a letter to Plaintiff rescinding his offer of employment.  In the letter, Judge Alston cited concerns about whether Plaintiff truthfully disclosed the circumstances of her resignation from Standish, her uncooperative behavior, and her desire to control the hiring process.  (Clark Dep. Ex. 6).

Plaintiff contends that she did not have an improper relationship with an inmate while she was employed at Standish.  Although she admits that they exchanged letters

3

and that she accepted a gift from him (Clark Dep. at 33-34), Plaintiff claims that, while she was employed at Standish, their relationship was not sexual. Rather, according to Plaintiff, after resigning from her position at Standish in February 1999, an inmate's mother contacted Plaintiff and asked if her son could write to her. Plaintiff agreed and then, began a relationship with this inmate, David Clark, whom she married in June 1999.

## II.    Standard of Review

Defendant moves for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some

4

"metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

Defendant also moves to dismiss the complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In reviewing the complaint for failure to state a claim upon which relief can be granted, the court liberally construes the complaint in favor of plaintiff and presumes that all allegations in the complaint are true. *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976) (citing *Davis H. Elliot Co. v. Caribbean Utils. Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir. 1975)). In order for a court to grant a motion to dismiss, it must appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). A court cannot grant a motion to dismiss just because it does not believe one of the allegations in the complaint. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990) (citing *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 1832 (1989)). "While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993).

However, Rule 12(b) of the Federal Rules of Civil Procedure provides:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be grated, matters outside the pleading are presented to and not excluded by the court, the motion shall be

> treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

FED. R. CIV. P. 12(b).  Because both Defendant and Plaintiff have attached exhibits to their Motion and Response, respectively, the Court will consider the motion as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## III.   Applicable Law and Analysis

Plaintiff alleges that Judge Alston withdrew his offer of employment because of her marital relationship with her husband in violation of her First Amendment right of freedom of association.  To establish retaliation for engaging in constitutionally protected activity in violation of 42 U.S.C. § 1983, Plaintiff must establish the following prima facie case:

> (1) The plaintiff engaged in protected conduct;
>
> (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
>
> (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000).  "In brief, this analysis focuses on whether the adverse employment action was motivated in substantial part by the plaintiff's constitutionally protected activity."  *Id.*   If Plaintiff establishes a prima facie case of retaliation, the burden then shifts to Defendant to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977).  To show pretext, "the plaintiff is required to show by a

6

preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the plaintiff's] discharge, or (3) that they were insufficient to motivate the discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

First, Plaintiff claims that she was retaliated against because of her exercise of her First Amendment right of intimate association with her husband, citing *Sowards v. Loudon County*, 203 F.3d 426, 433 (6th Cir. 2000), which held that an individual has the right to associate intimately with her husband, and her marriage relationship is protected from undue intrusion by the state.

In *Sowards*, the plaintiff was an employee in the Loudon County Sheriff's Department. *Id.* at 430. Her husband became a candidate for sheriff opposing the incumbent sheriff, her employer. *Id.* Approximately one year after the election, she was terminated and she alleged that the basis for her termination was the fact that she was married to the individual who had opposed her employer in the election. *Id.*

The Sixth Circuit found that she asserted a violation of her right of intimate association under the First Amendment. *Id.* at 433. The Court held that in order to violate an individual's constitutional right to associate intimately with her husband, the intrusion into the marriage relationship must be an "undue" intrusion by the state. *Id.* The Court found that there was no rational basis why that marriage relationship would in any way adversely affect her employment. Therefore, the denial of employment based on that marriage relationship was an "undue intrusion by the state into the marriage relationship." *Id.*; *see also Roberts v. United States Jaycees*, 468 U.S. 614, 617-18, 104

7

S.Ct. 3244, 3249 (1984) ("In one line of decisions, the court has concluded that choices to enter into and maintain certain human relationships must be secured against *undue* intrusion by the state because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.") (Emphasis added).

In contrast, in *Montgomery v. Carr*, 848 F. Supp. 770 (S.D. Ohio 1993), the district court found that the plaintiffs had failed to show an undue intrusion by the state. *Id.* at 776. In that case, the district court denied the plaintiffs' motion for a preliminary injunction seeking to enjoin their employer from transferring one spouse to a different school pursuant to the school's anti-nepotism policy. *See id.* at 778. The court reasoned:

> This is so because defendants presented evidence tending to show that the transfer was in the best interests of the educational goals of Great Oaks based on Dr. Carr's need to prevent problems from occurring, rather than waiting until they arise to address them. Defendants presented testimony indicating that the anti-nepotism policy prevents such potential problems as disruption of staff "collegiality", the lessening of productivity of spouses who work together, and the disruption of the educational program when spouses separate or divorce. Although some of these problems may be less serious or even non-existent in plaintiffs' case, the Court finds that defendants' identification of these problems may provide a sufficient basis for finding that defendants' anti-nepotism policy and their decision to transfer Mrs. Montgomery was not an "undue intrusion" into plaintiffs' First Amendment right to free association.

*Id.* at 776.

Thus, the mere fact that an employer uses an individual's marital relationship in an employment decision will not <u>always</u> constitute an undue or impermissible intrusion into the marital relationship. If the fact of the prospective employee being married to a particular individual may legitimately adversely affect the employment, in this Court's opinion, the consideration of such a factor does not violate a person's constitutional rights

of intimate association.  In an appropriate circumstance an employer may deny

employment to a prospective employee based on the person to whom the prospective

employee is married provided there is a reasonable basis for the denial.  *See, e.g.*, *Miller*

*v. CA Muer Corp.*, 420 Mich. 355, 363 n.10, 362 N.W.2d 650, 654 n.10 (1984)

(concluding that the Michigan Civil Rights Act, which prohibits employment decisions

based on "marital status" does not mean that an employer cannot refuse to hire an

individual based on the person to whom he or she is married because "[s]uch an

expansive construction of 'marital status' would also include in the protected class an

employee whose wife is the chief executive officer of his employer's major competitor.").

Similarly, in this case, in this Court's opinion, it was not an "undue" intrusion into

plaintiff's marital relationship for Judge Alston to deny an individual who was married to

a former inmate (or a former inmate) employment with the court.  It is undisputed that

Plaintiff admitted that she was married to someone who had been an inmate.  Certainly a

judge would be justified in denying employment to a former corrections officer who,

while employed at the prison, had a personal relationship with an inmate.  And while

there is no evidence that the relationship while Plaintiff was employed at the prison was

of a sexual nature, the fact that the marriage took place approximately one month after

she terminated her employment, strongly suggests that while she was employed there,

some type of "personal" relationship had to exist - - and a judge's concern about such a

relationship would be a legitimate business reason for denying employment.

Moreover, even assuming *arguendo* that Plaintiff could establish that Defendant's

conduct was an "undue intrusion" into her marriage relationship, Plaintiff has failed to

9

establish that her marital relationship was a substantial motivating factor in Judge

Alston's decision not to hire her.  *See Sowards*, 203 F.3d at 431.

Plaintiff contends that Judge Alston's answer as to whether he was concerned about

plaintiff being married to a former inmate – "not for that fact alone" (Alston Dep. at 12) –

suggests that the fact that she was married to a former inmate was a factor in his decision

not to hire her and thus raises a jury question as to whether or not her constitutional rights

to intimate association were violated.  The Court disagrees.  As counsel acknowledged at

the hearing, the "unlawful" factor has to be a "substantial motivating" factor.  *See*

*Sowards*, 203 F.3d at 431 ("In brief, this analysis focuses on whether the adverse

employment action was motivated in *substantial part* by the plaintiff's constitutionally

protected activity.") (Emphasis added); *see also Mattox v. City of Forest Part*, 183 F.3d

515, 520-21 (6th Cir. 1999) ("More simply framed, the issue is whether the adverse

action taken against plaintiffs by defendants was motivated in *substantial part* by the

protected activity of the plaintiffs . . . .") (Emphasis added).

In his November 24, 2004 letter, Judge Alston stated that the reasons for rescission

were as follows:

> Subsequent to the extension of our employment offer, matters came to our
> attention that created issues concerning whether you made a fair disclosure of
> facts concerning your employment with the Department of Corrections.  We then
> decided to look at your DOC employment history to ascertain the accuracy of
> your statements during your interview and to clear the air prior to your
> employment.
>
> Last Monday, I was informed by Ms. Lori Winiecke that you were very
> emotional and displeased about our process.  After consulting with an attorney,
> you decided to cooperate with our inquiry but insisted that future communication
> be with me instead of Ms. Winiecke.  You also stated that you wished to review

your DOC history, as provided by you, in our presence.  These are indications that it would be best for all concerned that we not initiate an employment relationship. . . .

(Ex. 6 to Clark Dep.; Rescission Letter).

In addition, Defendant's testimony articulates a valid rationale:

Q. Why did you rescind your offer of employment for the probation position?

A. Initially it was really due to how Ms. Clark conducted herself after we had received some information that her disclosures might not be full and/or fair.  We were not in a position to conclude that she had not made a full and fair disclosure, and we felt at that time that we wanted to investigate it to determine that.  And when we were getting, at least what was reported to me by Ms. Winiecke, that some of the behavior was quite emotional, that she wanted to provide it but she wanted to be there, and at that point I just really decided forget it. . . .

(Alston Dep. at 29).

After Winiecke learned that plaintiff had married an inmate, she informed Judge Alston what she had learned and told Judge Alston that she believed that "what the investigation in Standish was about was that [Clark] was having an improper relationship with an inmate and then later ended up marrying him, and it was apparently not the inmate that had propositioned her that we assumed from the story and her interview." (Winiecke Dep. at 38).  Winiecke in effect, testified that at the initial interview with plaintiff she believed that when Winiecke said she was propositioned by an inmate and he filed a complaint, that Winiecke had assumed it was about himself "and she never said it was against - - about another inmate."  (*Id.* at 58).  Winiecke further testified that had she been aware of a relationship with an inmate different than the one who propositioned her, ". . . [t]he whole thing would have been different from the outset."  (*Id.*).

Judge Alston asked Winiecke to speak to Clark ". . . about the discrepancies in the

11

two stories and asked if [Clark] would be willing to let him look over the report from the

Standish prison to see what actually did happen so we could clarify this before she came

to work . . . ."  (Winiecke Dep. at 39).

According to Winiecke, she contacted Plaintiff and during their conversation:

A. I told her that I had heard something that was different from what she told us in her job interview and was concerned that she had a relationship with an inmate while she was there and, in fact, married him, which showed that she must have had a relationship with him at the prison, otherwise where would she have met him.  And she told me that she did not have a relationship with him while she was working there, that it didn't start until after she had left her employment.  And I had asked her if she would be willing to sign the release of that report and give that to the judge to look at so we could clarify everything before she would be able to come and work here.

Q.  And what did she say about the release?

A.  She said she wasn't sure, she would get back to me.

Q.  Did Lisa Clark at any time to your knowledge ever refuse to sign a release so that the district court could obtain her records directly from the State of Michigan?

A.  When I heard back from her she said she was not going to sign it until she talked to an attorney.

(Winiecke Dep. at 40- 41).

Subsequently, plaintiff told Winiecke that she would sign a release.  (*Id.* at 41).

In addition, although Winiecke had no information that the relationship with the

inmate was sexual, she stated, "[a]ny relationship with an inmate concerned me in a

position of authority . . . [a]ny personal relationship with an inmate is a concern."  (*Id.* at

59).  Winiecke explained, "when you are in a position of authority, whether it be a prison

guard or a probation officer, you are not allowed to have any personal relationships with

people that you are supervising." (*Id.* at 60).

Judge Alston's deposition reveals similar "concerns." Judge Alston's answer to the question, "Were you concerned that Lisa Clark was married to a former inmate?" was "not for that fact alone." (Alston Dep. at 12). He further stated: "My recollection is that [Winiecke] informed me that this prior inmate was, I think, a person that was in prison at the facility in which she was working and that the relationship, alleged relationship, with a prisoner was the subject of . . . her leaving the department, you know, in connection with the investigation, that might have been the prisoner that she was having an improper relationship with." (*Id.* at 12-13). Judge Alston further testified that one of the reasons why he asked Winiecke to contact her was a concern that he had as to whether there was ". . . a reasonably fair and accurate disclosure of things during the interview." (*Id.* at 13).

He further testified that it was his recollection that initially Clark did not agree to provide copies of the investigation files and while he did not recall that she affirmatively stated she would not sign the release, his recollection is that "implicit in the communication to us that she would provide us those files, was not a yes answer to our request for release." (*Id.* at 14). Judge Alston does not dispute that Plaintiff subsequently sent a letter to him acknowledging: "I would like to turn over my copies and investigation from Standish Correctional Facility. I apologize for the delay in doing so. I wanted to consult with my attorney, Mr. Bosco, for professional advice before moving forward and hope that hasn't been misinterpreted as being uncooperative." (Alston Dep at 17). Judge Alston indicated that it was a concern of his that plaintiff was expressing some hesitancy or reluctance to communicate with Ms. Winiecke, preferring to deal with the judge

directly.

> Q.  Did you have a problem with Lisa Clark wanting to communicate with you instead of Ms. Winiecke?
>
> A.  Yes, in this sense.  As a prospective employer, we were trying to define our process.  I felt back at the time that Ms. Clark was trying to request or dictate the conditions upon which we were going to operate. And I do have to say that I personally don't view that sort of thing in a positive light.

(*Id.* at 26).

With reference to Clark's expressed desire to be present when Judge Alston reviewed the file, he stated that he "felt that I should be able to get those records directly from the department of corrections and review them with the - - in the privacy of my staff and to then decide what questions to ask of who."  (*Id.* at 27-28).

In this Court's opinion, based on the record before this Court, it is clear that the primary reason for plaintiff being denied employment was Judge Alston's concern that Plaintiff had not been completely truthful at the first interview; his concern that she had some hesitancy to permit him to review the investigative file by himself, and his concern that she may not be able to have a good working relationship with Ms. Winiecke - - who would be her supervisor.  Therefore, as an alternative grounds for dismissal, because Plaintiff's marriage to Mr. Clark was not a substantial motivating factor in Judge Alston's decision to deny her employment, Defendants are entitled to summary judgment.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

14

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Julie A. Gafkay, Esq.
Cynthia A. Arcaro, Esq.